1
2
3
4
5
6
7
8           **IN THE UNITED STATES DISTRICT COURT**

9           **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11  FREDERICK DEL SORTER,                    No. CIV S-08-0647-CMK

12                  Plaintiff,

13          vs.                              <u>MEMORANDUM OPINION AND ORDER</u>

14  COMMISSIONER OF SOCIAL
    SECURITY,
15
                    Defendant.
16
    _____/
17

18          Plaintiff, who is proceeding with retained counsel, brings this action for judicial

19  review of a final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g).

20  Pursuant to the written consent of all parties, this case is before the undersigned as the presiding

21  judge for all purposes, including entry of final judgment.  <u>See</u> 28 U.S.C. § 636(c).  Pending

22  before the court are plaintiff's motion for summary judgment (Doc. 22) and defendant's cross-

23  motion for summary judgment (Doc. 23).

24  / / /

25  / / /

26  / / /

                                            1

# I.  PROCEDURAL HISTORY

Plaintiff applied for social security benefits on March 18, 2005.[1]  In the application, plaintiff claims that disability began on July 21, 2001.  In his motion for summary judgment, plaintiff describes his impairments and limitations as follows:

> Mr. Sorter suffers from severe impairments which give rise to debilitating symptoms including: difficulty reading and writing, difficulty dealing with the public, pain, postural limitations, and sit/stand limitations, which combine to preclude him from performing substantial gainful activity.  His severe impairments include: borderline intellectual functioning, low IQ, degenerative disc disease, and a broad-based disc bulge with probable annular tear. . . .

Plaintiff's claim was initially denied.  Following denial of reconsideration, plaintiff requested an administrative hearing, which was held on April 24, 2007, before Administrative Law Judge ("ALJ") L. Kalei Fong.   In a September 21, 2007, decision, the ALJ concluded that plaintiff is not disabled based on the following relevant findings:

> 1.   The claimant has the following severe impairments: cervical and lumbar strain, and borderline intellectual functioning;
>
> 2.   The claimant has the residual functional capacity to perform light-medium unskilled work activity;
>
> 3.   The claimant is unable to perform past relevant work; and
>
> 4.   Considering the claimant's age, work experience, and residual functional capacity, the Medical-Vocational Guidelines indicate that there are jobs which exist in significant numbers in the national economy that the claimant can perform.

After the Appeals Council declined review on January 25, 2008, this appeal followed.

/ / /

/ / /

/ / /

/ / /

---

[1]   The record also contains an application for benefits dated February 26, 2002.  In the March 2005 application, plaintiff states that he filed a prior application.

## II. SUMMARY OF THE EVIDENCE

The certified administrative record ("CAR") contains the following evidence, summarized chronologically below:

August 3, 2001 – Physical therapy treatment notes reveal as follows: "He does well after his therapy but he has had to continue working carrying washers and dryers up and down stairs because he cannot afford to be out of work." (CAR 245).

August 24, 2001 – Physical therapy treatment notes reveal that plaintiff "went back to work Wednesday." (CAR 205, 235).

October 3, 2001 – Physical therapy treatment notes reflect that plaintiff had returned to work "approximately twice a week for 6 hours." (CAR 201, 220). As to this work, the notes indicate that plaintiff "does do some heavy work. . . ."

October 9, 2001 – The record contains a report of an MRI performed on plaintiff's spine. (CAR 196-97). Findings were normal at L1-2, L2-3, and L3-4. However, at L4-5, the following was noted: "Disc space narrowing and desiccation is seen" and ". . .broad-based grade I central disc bulge with some high signal intensity noted along the posterior annulus compatible with annular tear." At L5-S1, the following was noted: "Mild degenerative disc changes are seen."

October 10, 2001 – Physical therapy treatment notes indicate that plaintiff "did a lot of walking – elk hunting" and "[p]atient did a lot of walking while he was hunting over the weekend, however he stated that sitting and riding in the car increased his pain." (CAR 201, 218).

November 2, 2001 – Dr. Matthews prepared a discharge note. (CAR 210). The doctor stated:

> Fred returns, he has some persistent low back pain, otherwise he is doing very well and doesn't feel like the therapy at this point has made any new progress. He is pleased with the improvement that he has had. We had done an MRI because of the persistent problem in his lumbar spine. The MRI indicated L4-5 disc space narrowing and a broad-base grade (I)

central disc bulge.  I think that with his disc is the problem and with him lifting refrigerators and washers, that it is going to be difficult to have much improvement.  From a physical therapy standpoint he will be discharged.  However, he does have residual low back discomfort with further therapy to be determined.

January 18, 2002 – Dr. Mathews submitted a letter report regarding plaintiff. (CAR 186-87).  The doctor provided the following background:

Fred is a 35-year-old man whom we saw in late July [2001] after he had been in an automobile accident on the 25th, just a few days prior to his initial visit.  He was hit in a head-on fashion and then he ran over a telephone post after going through a chain link fence and so on.  The injury was severe enough to tear the battery cables out of his car.  He was not thrown from the car, but was wearing a lap seatbelt and he remembers that the impact tore the Levis on his right leg from the groin area down to his knees.  He had x-rays and evaluation at Jordan Valley Hospital and then he was seen here where he underwent vigorous physical therapy for the period until October [2001].

As to plaintiff's treatment and prognosis, Dr. Mathews stated:

. . . Over a three-month period vigorous physical therapy seemed to decrease the dysfunction and pain in his neck and upper back, but he had radicular low back discomfort that did not seem to respond.  Therefore, a MRI scan was ordered and he was found to have a broad-base grade 1 disc bulge at L4-5 with a probable annular tear of the ligament in addition to some mild degenerative changes of L5-S1.  Despite continued therapy and medication such a Vioxx, he did not respond and unfortunately the type of work he does; he delivers heavy appliances like refrigerators and washers, he has to carry them up and down stairs and bend over to install them.  I think from that type of work, he is probably permanently disabled with his annular tear and disc injury.  Unfortunately, he is not trained and I am feeling that from a mental status he is not capable of extensive training in more sophisticated sedentary work such as computer work, and therefore, may be permanently disabled from the manual labor force, other than some light duty-type work that he may find later.  Therefore, his disability rating would be 80% at least.  I do not think he will have any improvement in his low back unless he should have surgery at some point in time.  However, at this point, I am not quite convinced that surgery would be a great benefit to him, and I have not advised him to have it.

February 26, 2002 – In a prior application for benefits, plaintiff stated that he became unable to work due to disability on July 21, 2001.  (CAR 55).

/ / /

/ / /

4

1          <u>February 26, 2002</u> – In a disability adult report submitted with his prior

2    application, plaintiff stated that he had not worked at any time after July 21, 2001.  (CAR 76).

3    Specifically, plaintiff stated: "Was off work immediately after accident & have been advised by

4    doctor to go on disability."

5          <u>March 22, 2002</u> – The record contains a "Utah DDS Case Summary," apparently

6    relating to plaintiff's prior application for benefits.  (CAR 256).  This document reflects that

7    plaintiff was initially seen at Jordan Valley Hospital the day of his auto accident in 2001 and was

8    cleared for modified work until August 1, 2001.  As to plaintiff's credibility, the document

9    indicated: "Only partially claimant does have MRI findings to support some back pain but not to

10   the degree he alleges."

11         <u>March 22, 2002</u> – The record contains a residual physical functional capacity

12   assessment submitted by an agency consultative doctor.  (CAR 258-64).  The doctor opined that

13   plaintiff could occasionally lift up to 20 pounds and frequently lift up to ten pounds, sit/stand/

14   walk for up to six hours in an eight-hour day, and push/pull without limitation.  The doctor also

15   concluded that plaintiff could engage in postural activities (climbing, balancing, etc.)

16   occasionally.  No manipulative, visual, communicative, or environmental limitations were noted.

17         <u>March 18, 2005</u> – On the current application for benefits, plaintiff stated that he

18   became unable to work on July 21, 2001.  (CAR 58).

19         <u>March 18, 2005</u> – In a disability adult report submitted with the current

20   application, plaintiff stated again that he had not worked at all since the July 21, 2001, accident.

21   (CAR 124).

22         <u>March 31, 2005</u> – Plaintiff submitted an adult function report.  (CAR 138-45).  He

23   stated that he had no problems with personal care.  He also stated that he prepares meals for

24   himself daily, consisting of "eggs, fish," and that he experienced no changes in his cooking habits

25   since the onset date.  As to house work and yard work, plaintiff stated that he mows the lawn

26   once every two weeks and that he did not require help to complete this tasks.  Plaintiff stated that

he drives a car, goes outside every day, and goes shopping once a month.  He stated that he is able to handle his personal finances.  Plaintiff stated that he enjoys fishing and camping.  As to how often he does these things, he stated "all varies" but that he "can't enjoy it as much because my back hurts."  However, he later stated that he spends time with others fishing "every week."

> July 13, 2005 – Agency examining doctor Feng Bai, M.D., submitted a report following a complete orthopedic evaluation.  (CAR 274-78).  Dr. Bai reported the following history:

> > The claimant reported that on 07/24/2001, he had a motor vehicle accident.  He had pain in the back and went to the ER and had x-ray.  No fracture.  He was discharged home.  Later, he was treated with physical therapy and had a report of an MRI of the lumbar spine at end of 2001 and was told to have spinal fluid leakage.  The claimant reported that they went to do the epidural injection but he refused.  He did not have epidural injection.  He did not have surgery.  In the last three years, he did not have any treatment.  Currently, he is not taking any medication. . . .

On physical examination, Dr. Bai noted that plaintiff was not in acute distress and that he ambulated with normal gait without assistive device.  Plaintiff was able to tiptoe and heel walk without difficulty.  Back and neck range of motion were normal.  Dr. Bai reported:

> > There is a normal contour without evidence of scoliosis.  There is no paraspinal muscle spasm.  There is no tenderness to palpation over the spinous processes or paraspinal musculature.  There are no scars.  There is no pain with range of motion and no pain with axial rotation of the trunk.  There is no pain with axial loading of the spine at the head.

Range of motion in the upper and lower extremities was also normal.  Straight leg raising was negative bilaterally.  Impingement sign and speed testing were negative bilaterally.  Anterior and posterior Drawer sign was also negative bilaterally.  Dr. Bai noted only very minimal tenderness in the lower lumbar paraspinal muscle area without spasm.  Dr. Bai offered the following functional assessment:

> > Based on today's examination, it is my opinion he is able to lift and carry 100 pounds occasionally and 50 pounds frequently.  He is able to stand and walk 6 hours in an 8-hour workday and sit 6 hours in an 8-hour workday.  He has no limitation in bilateral upper extremities to reach all directions and doing gross or fine manipulation.

6

1    <u>July 18, 2005</u> – Agency examining psychologist Janice Nakagawa, Ph.D.,

2    submitted a report following a comprehensive psychological evaluation.  (CAR 280-84).

3    Plaintiff reported to Dr. Nakagawa that he did not graduate high school because he could not

4    read.  He also said that he began using marijuana in high school and last used it "a couple of

5    days" prior to his evaluation.  Dr. Nakagawa added: "Then he admitted that he might use it four

6    or five times a week if available to him."  As to daily activities, Dr. Nakagawa noted that plaintiff

7    mows the lawn and fishes.  On mental status examination, Dr. Nakagawa reported:

> Claimant arrived on time; he borrowed his sister's car to get to this
> appointment.  He was oriented to time, place, and person.  He said he was
> 6'3" and weighed 215 pounds.  He said he gained weight in the past few
> years, probably because he was not moving around much.  He looked his
> stated age.  Mood was euthymic, neither happy nor sad.  Affect was
> nonlabile.  Speech was relevant and coherent with no evidence of formal
> thought disorder.  There were no problems with psychomotor gait or
> movement.  He did not seem too uncomfortable sitting during the
> assessment.  On digit span, he recalled five digits forward.  Social
> judgment was fair.  He said he would "run out" if he were the first person
> to see smoke and fire in a movie theater.  Judgment and insight regarding
> his psychodynamics reflected a person who was not very psychologically
> minded.  Thinking was somewhat simplistic and concrete.  Still, he
> interpreted the proverb about spilled milk, saying, "Don't let it get to you."
> He denied any mental health problems or suicidal ideation.  He
> spontaneously said there were times when he felt stupid and, as a result, he
> felt shy and scared of people.  Indeed, his wishes included being less shy.
> He said, "I wish I were smarter – intelligent and not so scared of everyone
> and feel so shy toward everybody – things like that."

18   Plaintiff's verbal IQ was 67, his performance IQ was 79, and his full-scale IQ was 70.  Dr.

19   Nakagawa diagnosed marijuana abuse and borderline intellectual functioning and assigned a

20   Global Assessment of Functioning ("GAF") score of 68 on a 100-point scale.  The doctor offered

21   the following summary and impressions:

> Claimant is a 39-year-old, right-hand-dominant, single, Caucasian male
> who reports difficulties with reading and spelling in particular.  He also
> complained of chronic back problems as a result of an auto accident in
> 2001.  He received physical therapy and has not had treatment since that
> time.  Present testing indicates he functions overall in the borderline range
> with extremely low to low borderline verbal and borderline to low average
> nonverbal skills.  Weakness in verbal areas was noted for memory.  Visual
> immediate memory was in the low average range.  Given these patterns,
> there may well be a learning disability.  Without academic testing, only a

7

rule our of Learning Disorder NOS should be considered as a diagnosis. Screening measures are pretty consistent with functioning in the borderline range.

He seems to have no major restrictions in daily activities. He watches TV and does chores such as mowing the lawn every other week. He can maintain social functioning. He smokes marijuana if available; therefore, a diagnosis of Marijuana Abuse would be appropriate. He does not evidence any major problems with concentration, pace, or persistence. There is nothing to suggest episodes of emotional deteriorating in work-like situations. His functioning probably could improve if he were to abstain from marijuana use. He certainly could complete simple job instructions. He seems to have the social skills to deal with co-workers and supervisors. Given a certain degree of shyness, he may have more difficulty dealing with the public independently. He can deal with routines and changes in work routines. There may be motivational factors that may negatively impact on his work potential. There is no evidence to suggest malingering. Whether his physical limitations negatively impact on work capabilities must be addressed by the appropriate physician/specialist.

Claimant is not considered capable of managing his funds because of ongoing marijuana abuse.

August 2, 2005 – Agency consultative psychiatrist Susan Regan, M.D., submitted a psychiatric review technique form and mental residual functional capacity assessment. (CAR 287-303). Dr. Regan diagnosed organic mental disorder, mental retardation, memory impairment, and substance addiction disorder. The doctor assessed mild to moderate restrictions in activities of daily living, mild difficulties in maintaining social functioning, and moderate problems maintaining concentration, persistence, and pace. She did not feel there was sufficient evidence with respect to episodes of decompensation. As to other specific limitations, Dr. Regan concluded that plaintiff was moderately limited in his ability to: (1) understand, remember, and carry out detailed instructions; (2) maintain attention for extended periods; (3) perform activities within a schedule; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms; (5) interact appropriately with the general public; (6) respond appropriately to changes in the work setting; and (7) set realistic goals. In all other functional categories, Dr. Regan found that plaintiff was not significantly limited.

/ / /

1        April 24, 2007 – Plaintiff testified at the administrative hearing.  (CAR 330-44).

2    Plaintiff testified that he attended high school "[a]ll the way through the 12th grade" but was

3    "kicked out" before graduating.  He stated the he was in special education classes "[a]ll the way

4    through" and was not in any regular education classes, except for PE.  He testified that he can

5    read at the fourth or fifth grade level, but cannot read a newspaper.  He also stated that he cannot

6    write well.  Plaintiff testified, however, that he does not have any problems understanding in

7    spoken conversation.  Plaintiff stated that he had not received any medical treatment since 2002

8    due to lack of funds or insurance.  The ALJ stated that she would refer plaintiff for a post-hearing

9    evaluation.

10       June 14, 2007 – Agency examining physician Rajeswari Kumar, M.D., submitted

11   a report following a complete orthopedic evaluation.  (CAR 311-16).  Dr. Kumar reported the

12   following history:

13           The claimant reports that he was involved in an automobile accident on

14   07/21/2001.  He was seen in the emergency room and x-rays were taken, which did not reveal any fracture.  He reports that he had an MRI of the

15   cervical and lumbar spine a month later and reports that he was diagnosed as having disc pathology in the lower back and neck.  He reports that he was then started on physical therapy.

16

17           He received medications for pain relief and the symptoms had not improved.  He continues to have constant, sharp, and throbbing pain in the neck, which radiates down in both upper extremities and reports constant

18   sharp and throbbing lower back pain, which radiates down to both lower extremities.  He denied numbness or parasthesias in the upper and lower

19   extremities.  The pain is aggravated with sitting a few minutes, standing and walking a few minutes, and lifting.  He takes medications for pain

20   relief.

21   Plaintiff told Dr. Kumar that he experienced pain while mowing the lawn and fishing.  According

22   to Dr. Kumar, plaintiff's medication regimen for pain relief consisted only of Ibuprofen three

23   times a day.  On physical examination, Dr. Kumar noted:

24           Claimant sits and stands with normal posture.  There is no evidence of any tilt or list, and he sits comfortably during the examination.  In obtaining

25   the upright position, claimant rises from a chair without difficulty.  His gait is normal.  He walks on tiptoes and heels without difficulty with no

26   evidence of weakness in the ankle flexors or extensors.

> Claimant uses no assistive devices to ambulate and is able to get on and off the examining table without difficulty.

The doctor noted reduced range of motion on extension and lateral flexion of the neck.  He also observed decreased range of motion on extension and forward flexion of the back.  Straight leg raising was negative.  Spurling sign was negative in the neck.  Dr. Kumar noted no pain with range of motion of the back, although there was tenderness in the lumbar paraspinal region.  He noted smooth range of motion of all joints without evidence of crepitus.  Dr. Kumar diagnosed chronic neck and low back pain without radiculopathy.  The doctor provided the following functional assessment:

> Functional limitation is due to the limited range of motion of cervical and lumbar spine.  The claimant can lift and carry 50 pounds occasionally and 25 pounds frequently.  Standing and walking is unrestricted.  Sitting is unrestricted.  Upper extremity activities and kneeling and climbing activities are unrestricted.  The claimant can do frequent bending and stooping activities.

## III.  STANDARD OF REVIEW

The court reviews the Commissioner's final decision to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a whole.  See Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  "Substantial evidence" is more than a mere scintilla, but less than a preponderance.  See Saelee v. Chater, 94 F.3d 520, 521 (9th Cir. 1996).  It is ". . . such evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 402 (1971).  The record as a whole, including both the evidence that supports and detracts from the Commissioner's conclusion, must be considered and weighed.  See Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the Commissioner's decision simply by isolating a specific quantum of supporting evidence.  See Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative

1   findings, or if there is conflicting evidence supporting a particular finding, the finding of the

2   Commissioner is conclusive.  See Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987).

3   Therefore, where the evidence is susceptible to more than one rational interpretation, one of

4   which supports the Commissioner's decision, the decision must be affirmed, see Thomas v.

5   Barnhart, 278 F.3d 947, 954 (9th Cir. 2002), and may be set aside only if an improper legal

6   standard was applied in weighing the evidence, see Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th

7   Cir. 1988).

8

9   **IV.  DISCUSSION**

10          In his motion for summary judgment, plaintiff argues: (1) the ALJ erred by

11  concluding that his mental impairment does not meet or medically equal the criteria of

12  § 12.05(C) of the Listing of Impairments; (2) the ALJ failed to develop the record by re-

13  contacting Dr. Mathews; (3) the ALJ erred by concluding that plaintiff's testimony and

14  statements were not credible; and (4) the ALJ erred by applying the Medical-Vocational

15  Guidelines in lieu of obtaining testimony from a vocational expert.

16  **A.      Applicability of § 12.05(C) of the Listing of Impairments**

17          The Social Security Regulations "Listing of Impairments" is comprised of

18  impairments to fifteen categories of body systems that are severe enough to preclude a person

19  from performing gainful activity.  Young v. Sullivan, 911 F.2d 180, 183-84 (9th Cir. 1990); 20

20  C.F.R. § 404.1520(d).  Conditions described in the listings are considered so severe that they are

21  irrebuttably presumed disabling.  20 C.F.R. § 404.1520(d).  In meeting or equaling a listing, all

22  the requirements of that listing must be met.  Key v. Heckler, 754 F.2d 1545, 1550 (9th Cir.

23  1985).

24          As to the Listing § 12.05, the ALJ stated:

25          Due to the severity of the claimant's mental impairments, the undersigned
            has carefully considered whether these impairments meet the requisite
26          criteria found in any of the section 12.00 listings.  In this case, because the

evidence on record shows that the claimant's impairments are characterized by IQ scores in the borderline range and difficulties in reading, it is necessary to evaluate his degree of limitation utilizing the "B" criterial of section 12.05 in order to determine whether his impairments meet or equal the listing.

Upon review of the medical evidence on record, the undersigned has determined that the claimant has mild restrictions in his activities of daily living, mild difficulty in maintaining social functioning, moderate deficiencies of concentration, persistence, or pace, and has not experienced frequent episodes of decompensation in a work-like setting. Accordingly, the undersigned finds that the claimant's impairments, although severe, do not meet or equal the criterial of section 12.05.

In making this determination concerning the "B" criteria areas of function, the undesigned has given substantial weight to the assessment of Janice Nakagawa, Ph.D., who examined the claimant in July 2005. Dr. Nakagawa administered psychological testing in which scores showed overall intellectual functioning in the borderline range with extremely low-low borderline verbal and borderline–low average nonverbal skills. Weakness in verbal areas was also noted for memory. Dr. Nakagawa established a Global Assessment of Functioning (GAF) score of 68. Such a score is indicative of some mild difficulties in social and occupational functioning, but generally such an individual functions pretty well and has some meaningful interpersonal relationships. She noted no major restrictions in daily activities and reported that the claimant can maintain social functioning.

Moreover, no treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment. Hence, the objective medical evidence does not warrant an affirmative finding at this step.

Plaintiff argues that ". . . the ALJ's 12.05 'listing' analysis was a confusing jumble." Plaintiff states that Listing § 12.05(C) is satisfied by a full-scale IQ score of 60 through 70 and physical or other mental impairment imposing additional and significant work-related limitations of function is documented and initially manifests before the age 22. According to plaintiff, the ALJ failed to consider these specific requirements.

Plaintiff argues that § 12.05(C) is met in his case because his verbal IQ score is 67, his full-scale IQ is 70, and the record establishes that his low intellectual functioning manifested before he was 22. In particular, as to evidence of manifestation prior to age 22, he notes that he was in special education classes and dropped out of high school in the eleventh

1    grade. Based on this, plaintiff concludes that his ". . . low intellectual functioning certainly

2    manifested prior to age 22." He adds that his other physical impairments satisfy the requirement

3    of Listing § 12.05(C) of impairments which impose significant work-related limitations. Plaintiff

4    states that a remand for payment of benefits is required.

5         The court finds that plaintiff's argument is unpersuasive. As defendant notes,

6    Listing § 12.05(C) requires evidence that the diagnostic description of mental retardation is

7    satisfied, as well as evidence of deficits in adaptive functioning initially manifested before age

8    22. See Randle v. Astrue, 2008 WL 4507607 at *5 (E.D. Cal. 2008). There is substantial

9    evidence to support the ALJ's conclusion that plaintiff's mental impairment is borderline

10    intellectual functioning and not mental retardation. While Dr. Regan, an agency consultative

11    doctor, indicated diagnoses of mental retardation and organic brain disorders, the ALJ was

12    entitled to give greater weight to Dr. Nakagawa's assessment because she actually examined

13    plaintiff. Dr. Nakagawa specifically diagnosed borderline intellectual functioning and noted that

14    there was no evidence in the record to establish a learning disorder. Dr. Nakagawa also opined

15    that plaintiff's functional capabilities would likely improve if he discontinued marijuana use. In

16    short, there is no substantial evidence of mental retardation.

17         In addition, plaintiff has not documented a significant work-related limitation

18    which manifested before age 22. The only evidence he presents is his testimony that he did not

19    graduate from high school and attended special education classes while he was in school.

20    Contrary to plaintiff's argument that all he needs to show is manifestation of low intellectual

21    functioning before age 22, which attending special education classes may tend to show, plaintiff

22    must establish manifestation of a documented significant work-related limitation. He has failed

23    to show any link between his attending special education classes and a documented significant

24    work-related limitation. In particular, plaintiff has not presented any school records, academic

25    testing results, or psychological data covering his high school years.

26    / / /

**B.** **Duty to Develop the Record**

The ALJ has an independent duty to fully and fairly develop the record and assure that the claimant's interests are considered.  See Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).  When the claimant is not represented by counsel, this duty requires the ALJ to be especially diligent in seeking all relevant facts.  See id.  This requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts."  Cox v. Califano, 587 F.2d 988, 991 (9th Cir. 1978).   Ambiguous evidence or the ALJ's own finding that the record is inadequate triggers this duty.  See  Tonapetyan, 242 F.3d at 1150.  The ALJ may discharge the duty to develop the record by subpoenaing the claimant's physicians, submitting questions to the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow for supplementation of the record.  See id. (citing Tidwell v. Apfel, 161 F.3d 599, 602 (9th Cir. 1998)).

Plaintiff argues that the ALJ should have re-contacted Dr. Mathews.  Plaintiff states:

> Indeed, given the state of the record, the ALJ should have re-contacted Dr. Mathews, the treating physician, for his opinion regarding Mr. Sorter's residual functional capacity.  The ALJ acknowledged that Dr. Mathews was Mr. Sorter's treating physician and, at the conclusion of the hearing, bemoaned the lack of evidence regarding Mr. Sorter's disability.  Nevertheless, he failed to re-contact Dr. Mathews for his opinion of Mr. Sorter's residual functional capacity.  The Commissioner's own regulations recommend that an ALJ re-contact a treating or examining source when the evidence from the source is inadequate to determine whether the claimant is disabled. . . .  The ALJ failed to make any effort to re-contact Dr. Mathews even though he sent Mr. Sorter out for a number of consultative examinations after his hearing.  Re-contacting the treating physician, as provided by law, was the indicated course of action.

Plaintiff cites 20 C.F.R. § 404.1512, which provides that the ALJ will first re-contact a treating source when ". . . the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques."  Plaintiff concludes that, "[a]t a minimum, Mr. Sorter's case requires remand so that Dr. Mathews can be re-

1    contacted for clarification and an accurate assessment of Mr. Sorter's residual functional capacity

2    can be secured."

3            As to Dr. Mathews, the ALJ stated:

4            . . . Jeffrey Mathews, M.D., P.C., reported on the claimant's progress
             following physical therapy due to motor vehicle accident in 2001. In
5            January 2002, Dr. Mathews noted a decrease in dysfunction and pain in the
             neck and back; however, radicular low back discomfort did not appear to
6            respond. Dr. Mathews assessed that the claimant may be permanently
             disabled from his most recent job of delivering and installing heavy
7            appliances and other manual labor other than light duty-type work. He
             opined that surgery would not be of great benefit and did not advise the
8            claimant to proceed with such. Dr. Mathews noted that the claimant
             appeared to be mentally incapable of extensive training in more
9            sophisticated sedentary work such as computer work. Noting consistency
             with the record as a whole, the undersigned assigns significant weight to
10           Dr. Mathews' opinion.

11   The ALJ then discussed the opinions as to plaintiff's functional capacity, both physical and

12   mental, expressed by Drs. Bai, Kumar, and Nakagawa, as well as the agency consultative doctors.

13   The ALJ found that all the medical opinions were consistent with each other and the evidence of

14   record and concluded as follows:

15           The substantial evidence of record, as noted above, confirms that the
             claimant continues to have problems with neck and radicular back pain
16           and experiences borderline intellectual functioning. Despite these
             conditions, opinions of examining and non-examining practitioners
17           support the findings regarding the claimant's ability to perform work-
             related activities. Even with the limitations that the claimant's conditions
18           impose, the record supports that the claimant has the ability to perform
             unskilled light-medium work activity. This contention is supported by
19           objective findings and medical source statements contained in the
             longitudinal record.

20

21           Contrary to plaintiff's apparent assertion regarding the "state of the record,"

22   nothing in the record was inconsistent or ambiguous. Initially, the court observes that the ALJ

23   credited Dr. Mathews' January 2002 opinion, which was clear as to plaintiff's functional

24   capability at the time he last treated plaintiff in late 2001. Dr. Mathews noted that plaintiff's

25   work involved heavy lifting and carrying as well as bending and the doctor opined: "I think from

26   that type of work, he is probably permanently disabled with his annular tear and disc injury."

                                              15

1  (emphasis added).  This is consistent with the ALJ's finding that plaintiff could do, at most,

2  medium work, as opposed to the type of heavy work precluded by Dr. Mathews.  The ALJ further

3  accepted Dr. Mathews' opinion by concluding that plaintiff could not perform his past relevant

4  work.  There simply were no inconsistencies.

5          Similarly, the record was not ambiguous.  Rather, the record was quite clear as to

6  plaintiff's functional capabilities.  Every doctor who examined plaintiff or reviewed his records

7  generally agreed that plaintiff could engage in at least light work and probably up to medium

8  work.  Dr. Mathews opined that plaintiff could perform "light duty-type" work.  An agency

9  doctor opined in March 2002 that plaintiff had the residual functional capacity to perform light

10  work.  Dr. Bai concluded in July 2005 that plaintiff could do medium work.  And, in June 2007,

11  Dr. Kumar opined that plaintiff could do activities consistent with medium work.

12          Finally, regarding plaintiff's contention that the lack of evidence triggered the

13  ALJ's duty to further develop the record, the court does not agree.  The lack of evidence was the

14  result of plaintiff's lack of treatment, not the ALJ's failure to develop the record.  In other words,

15  nothing the ALJ could have done would have supplied evidence of treatment where there was

16  none.  The absence of evidence of a disabling impairment – which was plaintiff's burden to

17  produce – does not mean that the evidence which was available was either inconsistent or

18  ambiguous.  Because the evidence in this case was neither, the duty to further develop the record

19  was never triggered.  In any event, the ALJ did in fact develop the record as much as possible by

20  referring plaintiff for a post-hearing evaluation by Dr. Kumar in order to obtain a current

21  functional assessment.

22      **C.      Plaintiff's Credibility**

23          The Commissioner determines whether a disability applicant is credible, and the

24  court defers to the Commissioner's discretion if the Commissioner used the proper process and

25  provided proper reasons.  See Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1996).  An explicit

26  credibility finding must be supported by specific, cogent reasons.  See Rashad v. Sullivan, 903

F.2d 1229, 1231 (9th Cir. 1990).  General findings are insufficient.  See Lester v. Chater, 81 F.3d 821, 834 (9th Cir. 1995).  Rather, the Commissioner must identify what testimony is not credible and what evidence undermines the testimony.  See id.  Moreover, unless there is affirmative evidence in the record of malingering, the Commissioner's reasons for rejecting testimony as not credible must be "clear and convincing."  See id.; see also Carmickle v. Commissioner, 533 F.3d 1155, 1160 (9th Cir. 2008) (citing Lingenfelter v Astrue, 504 F.3d 1028, 1936 (9th Cir. 2007), and Gregor v. Barnhart, 464 F.3d 968, 972 (9th Cir. 2006)).

       If there is objective medical evidence of an underlying impairment, the Commissioner may not discredit a claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence.  See Bunnell v. Sullivan, 947 F.2d 341, 347-48 (9th Cir. 1991) (en banc).  As the Ninth Circuit explained in Smolen v. Chater:

> The claimant need not produce objective medical evidence of the [symptom] itself, or the severity thereof.  Nor must the claimant produce objective medical evidence of the causal relationship between the medically determinable impairment and the symptom.  By requiring that the medical impairment "could reasonably be expected to produce" pain or another symptom, the Cotton test requires only that the causal relationship be a reasonable inference, not a medically proven phenomenon.

80 F.3d 1273, 1282 (9th Cir. 1996) (referring to the test established in Cotton v. Bowen, 799 F.2d 1403 (9th Cir. 1986)).

       The Commissioner may, however, consider the nature of the symptoms alleged, including aggravating factors, medication, treatment, and functional restrictions.  See Bunnell, 947 F.2d at 345-47.  In weighing credibility, the Commissioner may also consider: (1) the claimant's reputation for truthfulness, prior inconsistent statements, or other inconsistent testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; (3) the claimant's daily activities; (4) work records; and (5) physician and third-party testimony about the nature, severity, and effect of symptoms.  See Smolen, 80 F.3d at 1284 (citations omitted).  It is also appropriate to consider whether the claimant cooperated during physical examinations or provided conflicting statements concerning

drug and/or alcohol use.  See Thomas v. Barnhart, 278 F.3d 947, 958-59 (9th Cir. 2002).  If the claimant testifies as to symptoms greater than would normally be produced by a given impairment, the ALJ may disbelieve that testimony provided specific findings are made.  See Carmickle, 533 F.3d at 1161 (citing Swenson v. Sullivan, 876 F.2d 683, 687 (9th Cir. 1989)).

As to plaintiff's credibility, the ALJ stated:

> Because a claimant's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 CFR 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the undersigned must consider in addition to the objective medical evidence when assessing the credibility of the claimant's statements:
>
> 1.  The claimant's daily activities;
>
> 2.  The location, duration, frequency, and intensity of the claimant's pain or other symptoms;
>
> 3.  Factors that precipitate and aggravate the symptoms;
>
> 4.  The type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms;
>
> 5.  Treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms;
>
> 6.  Any measures other than treatment the claimant uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
> 7.  Any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms (SSR 96-7p).
>
> In this record, the claimant testified that he was in special education classes at school and reads at a 4th-5th grade level, having trouble reading the newspaper and writing a letter.  He reported that he had a motor vehicle accident in 2001 and went to therapy that showed a dislocated disc. He stated that he has had no treatment since then because he has no insurance.  He reported that they did x-rays in 2005 and told him that nothing was wrong with him, but pain is shooting up his legs.  He reported that he lives with his mom and family.  In Ex. 2E, the claimant reported that he cannot work because of back pain and is unable to lift or stand for any length of time as he is in continual pain.  The claimant reported that he sits around and watches TV and finds it hard to get up and down and lift heavy things.  He noted that his back hurts when he sleeps on it.  He reported that he prepares his own meals, cooking eggs and fish; mows the lawn; goes out everyday; drives a car; shops; and fishes and camps.  He

reported that he can walk for a block or two (10-15 minutes).  He notes that he cannot pay attention for too long; cannot follow instructions well as he cannot read; can follow spoken instructions if he remembers; does not get along well with authority figures; and does not handle stress and changes in routine well (Ex. 13E).

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely credible.  The claimant alleges disability due to back injuries and illiteracy.  The evidence shows that, although he continues to experience some difficulties due to residual back discomfort following cervical and lumbar strain in a 2001 motor vehicle accident, MRI tests and physical examination indicated that the claimant is able to move about without significant limitation.  The claimant has received no treatment following initial conservative treatment regimens which mainly included physical therapy in 2001.  The claimant has not received epidural injections nor has surgery been recommended.  He does not take strong medications, but rather Ibuprofen for his pain concerns.  He exhibits no limitations as to his daily activities as he drives, sees to his personal needs, mows the lawn, prepares food daily, and goes fishing and camping.  Despite being identified with borderline intellectual functioning, the claimant is able to think, communicate, and act in his own best interests and remember and follow simple instructions.  The undersigned notes that the claimant appeared healthy at the hearing and responded well to questioning.

In challenging the ALJ's credibility assessment, plaintiff begins by identifying the bases for the finding as follows:

The ALJ cited three reasons for discrediting Mr. Sorter's testimony: 1) MRI tests and examinations indicated he could "move about without significant limitation"; 2) he received no treatment after 2001 and did not take strong medication; and 3) "he drives, sees to his personal needs, mows the lawn, prepares food daily, and goes fishing and camping."

Plaintiff argues that these reasons are not supported by the evidence.

1.   Objective Findings

As to objective findings cited by the ALJ – MRI test results and other examination data – plaintiff argues:

. . . First . . . the MRI report did not reflect that Mr. Sorter could move without "significant limitation."  The MRI report reflected disc narrowing and dessication, a broad-based disc bulge, and disc

19

1
2
3
4

degeneration.  Evidently, the ALJ interpreted the MRI findings to mean that Mr. Sorter could get around without significant limitation.  In fact, Mr. Sorter was not bed bound.  Nor did he testify that he could not move around.  He reported that he was in pain and that certain activities, like sleeping, lifting, walking, standing, sitting, kneeling, reaching, and squatting, were limited by his back impairment.  TR 143.

5   Plaintiff's argument is unpersuasive given that he focuses too narrowly on the MRI results.  It

6   would seem that plaintiff reads the hearing decision as saying that the ALJ's conclusion that

7   plaintiff could "move about without significant limitation" is based solely on the MRI results.

8   This is not correct.  The ALJ specifically based her conclusion on "MRI test results <u>and</u> physical

9   examination."  (emphasis added).  The conclusion is supported by the record.  As outlined above,

10  the MRI scan did not reveal any severe problems.  Further, the assessments of Drs. Bai and

11  Kumar that plaintiff could perform medium work are consistent with minimal MRI findings.

12  Drs. Bai and Kumar also observed physical examination testing data – such as negative straight

13  leg raising, negative Spurling sign, normal range of motion, ability to ambulate with normal gait

14  and without any limp, etc. – supporting the ALJ's conclusion that the evidence shows that

15  plaintiff can move about without significant limitation.

16          In sum, the objective data – including the MRI scan results – is consistent with the

17  ALJ's analysis as to plaintiff's functional capacity and inconsistent with plaintiff's statements as

18  to the intensity and limiting effects of his impairments.

19          2.      Treatment/Medication

20  Regarding treatment and medication, plaintiff argues:

21
22
23
24
25
26

. . .Second, Mr. Sorter repeatedly testified that the reason he did not receive follow-up care was because he did [not] have medical insurance or the funds to pay for medical treatment.  Consequently, he was not prescribed medication which he could not, at any rate, afford.  He explained, "Well see, if I have medical or something like that, I'd probably go all the time – but like when I was out there I had to file bankruptcy because I didn't have nothing, you know, I didn't have no kind of funds to pay for it or nothing."  TR 343.  Moreover, at the hearing the ALJ specifically acknowledged Mr. Sorter's lack of funds for medical treatment.  He stated: "And I realize you don't have the funds, you know, to pay for treatment.  What I'm going to do is, I'm going to order a

1    consultative evaluation."  TR 343.

2   In response to plaintiff's argument that his inability to afford further treatment should not be used

3   against him, defendant states:

4           . . . Although Plaintiff argued that he could not afford any further
        treatment or medication, he provided no indication that he needed more
5       treatment than the limited treatment he initially received following his
        accident. . . .

6

7   As defendant suggests, the lack of treatment after plaintiff completed physical therapy with Dr.

8   Mathews in late 2001 was noted by the ALJ insofar as it indicated that more aggressive treatment

9   was not warranted by his condition.  In other words, even if plaintiff could have afforded further

10  treatment, such treatment would not have been necessary given the objective evidence of the

11  extent of his impairment.  It was not plaintiff's inability to afford treatment that was noted by the

12  ALJ; it was the lack of necessity for further treatment.

13          3.    Daily Activities

14          Regarding daily activities, plaintiff states:

15          . . . Third, there was no evidence that Mr. Sorter camped – he
        stated that he like[s] to fish and camp but only reported significantly
16      diminished fishing activity, which caused him pain.  TR 312.  As of July
        of 2005, he reported fishing about once a month.  TR 281.  With respect to
17      mowing the lawn, he reported that he only did it twice a month.  He also
        reported that mowing the lawn caused him pain and that he needed
18      intermittent rest.  TR 312.

19  Plaintiff cites Reddick v. Chater, 157 F.3d 715 (9th Cir. 1998), and adds that "mere evidence of

20  the ability to perform housework, visit his brother, shop alone, or go to the doctor is not . . .

21  inconsistent with a finding of disability."

22          Plaintiff's challenge to the ALJ's analysis of his daily activities lacks any merit.

23  The record clearly demonstrates that plaintiff engaged in activities after July 2001 which

24  completely contradict his statements that he is totally disabled as a result of that accident.  For

25  example, physical therapy notes from August and October 2001 indicate that plaintiff was

26  continuing to work "carrying washers and dryers up and down stairs" and that he had returned to

1   work "approximately twice a week for 6 hours" a day.  This evidence directly contradicts

2   plaintiff's statements submitted with his February 2002 prior application and the current

3   application that he engaged in no work activity after July 2001.   This evidence also contradicts

4   plaintiff's statements of disabling limitations.  Additionally, physical therapy notes from October

5   2001 reveal that plaintiff "did a lot of walking – elk hunting" and "[p]atient did a lot of walking

6   while he was hunting over the weekend."   These activities are also inconsistent with plaintiff's

7   statements of disabling limitations.  Finally, as the ALJ noted, plaintiff's routine activities of

8   mowing the lawn, camping, and fishing "every week" do not suggest a disabling impairment.

9          As to plaintiff's citation to Reddick v. Chater, it is almost unbelievable that

10  plaintiff suggests to this court that his activities following the July 2001 accident, as reported to

11  the doctors and as described in plaintiff's various statements, are consistent with a finding of

12  disability and inconsistent with an adverse credibility finding.  Most notably, plaintiff admitted to

13  his physical therapist that he worked in August and October 2001.  It is obvious that plaintiff was

14  not truthful in his February 2002 and March 2005 applications when he stated that he could not

15  work, and did not work, at any time after July 2001 because of disability.

16      **D.    Applicability of the Medical-Vocational Guidelines**

17          The Medical-Vocational Guidelines ("Grids") provide a uniform conclusion about

18  disability for various combinations of age, education, previous work experience, and residual

19  functional capacity.  The Grids allow the Commissioner to streamline the administrative process

20  and encourage uniform treatment of claims based on the number of jobs in the national economy

21  for any given category of residual functioning capacity.  See Heckler v. Campbell, 461 U.S. 458,

22  460-62 (1983) (discussing creation and purpose of the Grids).

23          The Commissioner may apply the Grids in lieu of taking the testimony of a

24  vocational expert only when the Grids accurately and completely describe the claimant's abilities

25  and limitations.  See Jones v. Heckler, 760 F.2d 993, 998 (9th Cir. 1985); see also Heckler v.

26  Campbell, 461 U.S. 458, 462 n.5 (1983).  Thus, the Commissioner generally may not rely on the

1  Grids if a claimant suffers from non-exertional limitations because the Grids are based on

2  exertional strength factors only.[2]  See 20 C.F.R., Part 404, Subpart P, Appendix 2, § 200.00(b).

3  "If a claimant has an impairment that limits his or her ability to work without directly affecting

4  his or her strength, the claimant is said to have non-exertional . . . limitations that are not covered

5  by the Grids."  Penny v. Sullivan, 2 F.3d 953, 958 (9th Cir. 1993) (citing 20 C.F.R., Part 404,

6  Subpart P, Appendix 2, § 200.00(d), (e)).  The Commissioner may, however, rely on the Grids

7  even when a claimant has combined exertional and non-exertional limitations, if non-exertional

8  limitations do not impact the claimant's exertional capabilities.  See Bates v. Sullivan, 894 F.2d

9  1059, 1063 (9th Cir. 1990); Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988).

10            In cases where the Grids are not fully applicable, the ALJ may meet his burden

11  under step five of the sequential analysis by propounding to a vocational expert hypothetical

12  questions based on medical assumptions, supported by substantial evidence, that reflect all the

13  plaintiff's limitations.  See Roberts v. Shalala, 66 F.3d 179, 184 (9th Cir. 1995).  Specifically,

14  where the Grids are inapplicable because plaintiff has sufficient non-exertional limitations, the

15  ALJ is required to obtain vocational expert testimony.  See Burkhart v. Bowen, 587 F.2d 1335,

16  1341 (9th Cir. 1988).

17

---

18            [2]        Exertional capabilities are the primary strength activities of sitting, standing,
walking, lifting, carrying, pushing, or pulling and are generally defined in terms of ability to
19  perform sedentary, light, medium, heavy, or very heavy work.  See 20 C.F.R., Part 404, Subpart
P, Appendix 2, § 200.00(a).  "Sedentary work" involves lifting no more than 10 pounds at a time
20  and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  See 20
C.F.R. §§ 404.1567(a) and 416.967(a).  "Light work" involves lifting no more than 20 pounds at
21  a time with frequent lifting or carrying of objects weighing up to 10 pounds.  See 20 C.F.R. §§
404.1567(b) and 416.967(b).  "Medium work" involves lifting no more than 50 pounds at a time
22  with frequent lifting or carrying of objects weighing up to 25 pounds.  See 20 C.F.R. §§
404.1567(c) and 416.967(c).  "Heavy work" involves lifting no more than 100 pounds at a time
23  with frequent lifting or carrying of objects weighing up to 50 pounds.  See 20 C.F.R. §§
404.1567(d) and 416.967(d).  "Very heavy work" involves lifting objects weighing more than
24  100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more.
See 20 C.F.R. §§ 404.1567(e) and 416.967(e).
25            Non-exertional activities include mental, sensory, postural, manipulative, and
environmental matters which do not directly affect the primary strength activities.  See 20 C.F.R.,
26  Part 404, Subpart P, Appendix 2, § 200.00(e).

In applying the Grids, the ALJ acknowledged the existence of non-exertional limitations and stated:

> In the present instance, the claimant's ability to perform all or substantially all of the requirements of light-medium work is impeded by additional non-exertional limitations. The undersigned notes that Social Security Ruling 85-15 also provides a basis for a conclusion that the occupational base would not be significantly eroded by the claimant's non-exertional limitations which, as noted above, consist of the restriction to unskilled work tasks. Social Security Ruling 85-15 states that the basic demands of unskilled work are defined as understanding, remembering, and carrying out simple instructions; responding appropriately to supervision, co-workers, and usual work situations; dealing with changes in a routine work setting; and making judgments that are commensurate with the functions of unskilled work, i.e., simple work-related decisions. Thus, the claimant's borderline intellectual functioning would not have a significant impact on the broad world of unskilled work. Accordingly, the undersigned finds that the claimant's non-exertional limitations do not significantly erode the occupational base.

Although it appears that a vocational expert was present at the hearing, no expert testimony was obtained. Citing <u>Bruton v. Massanari</u>, 268 F.3d 824 (9th Cir. 2001), plaintiff argues that ". . . the ALJ is required to use the services of a vocational expert where the medical evidence *suggests* that a claimant's impairments *may* amount to a non-exertional impairment." (emphasis by plaintiff). Plaintiff concludes that evidence of "an extremely low IQ, difficulty reading and writing, and difficulty dealing with the public" triggered the requirement to obtain testimony from a vocational expert.

Plaintiff's reliance on <u>Bruton</u> is misplaced. In <u>Bruton</u>, the Ninth Circuit re-stated the rule outlined above that "'significant non-exertional impairments . . . may make reliance on the grids inappropriate.'" <u>Id.</u> at 828 (citing <u>Desrosiers v. Sec'y Health & Human Servs.</u>, 846 F.2d 573, 577 (9th Cir. 1988)). In <u>Bruton</u>, the medical evidence indicated that the plaintiff was precluded from "prolonged carrying, forceful pushing and pulling, and work *at or above the shoulder level*." <u>Bruton</u>, 268 F.3d at 828 (emphasis in original). While the court did state that the inability of a claimant to lift his arms above ninety degrees may be considered a non-exertional limitation, and that the evidence suggested this particular limitation, <u>see id.</u>, the case is

distinguishable from this case because, here, there is no suggestion of a <u>significant</u> non-exertional

limitation.  Unlike <u>Bruton</u>, where the evidence indicated that the plaintiff was precluded from

work at or above shoulder level, suggesting a significant limitation, there is no evidence that

plaintiff's low IQ, difficulties reading, or shyness pose significant limitations.  Notwithstanding

these problems, Dr. Nakagawa concluded: (1) plaintiff can maintain social functioning;

(2) plaintiff does not have any major problems with concentration, pace, or persistence;

(3) plaintiff can complete simple job instructions; and (4) plaintiff can deal appropriately with

co-workers and supervisors.  Dr. Regan agreed.  Given evidence of only minimal non-exertional

limitations, the ALJ's reliance on the Grids was not improper.

### V.  CONCLUSION

Based on the foregoing, the court concludes that the Commissioner's final

decision is based on substantial evidence and proper legal analysis.  Accordingly, IT IS HEREBY

ORDERED that:

1.      Plaintiff's motion for summary judgment (Doc. 22) is denied;

2.      Defendant's cross-motion for summary judgment (Doc. 23) is granted; and

3.      The Clerk of the Court is directed to enter judgment and close this file.

DATED: June 1, 2009

_Craig M. Kellison_

_____

**CRAIG M. KELLISON**
UNITED STATES MAGISTRATE JUDGE